AUSA Christopher P. Hotaling, (312) 353-5324
AUSA Bethany K. Biesenthal, (312) 886-7629

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JASON FOSTER, aka "Sleepy"

**FILED**
KC
NOV 2 6 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNDER SEAL**
MAGISTRATE JUDGE COLE

CRIMINAL COMPLAINT

CASE NUMBER 07CR 772

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __March 14, 2007__ in __Kane__ county, in the __Northern__ District of __Illinois__ defendant,

knowingly and intentionally distributed a controlled substance, namely in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section __841(a)(1)__.

I further state that I am a __Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives__ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

November 26, 2007                                at    Chicago, Illinois
Date                                                        City and State

JEFFREY COLE, U.S. Magistrate Judge              _____
Name & Title of Judicial Officer                        Signature of Judicial Officer

STATE OF ILLINOIS    )
                     )
COUNTY OF COOK       )

## AFFIDAVIT

I, Mark A. Anton, after being duly sworn, state as follows:

1. I am a Special Agent, U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Chicago Field Division's Fox Valley Gang Violence Task Force, and have been so employed for eight years. Prior to ATF, I was employed for seven years as a state narcotics agent with the Wisconsin Department of Justice, Division of Narcotics Enforcement, assigned to the Milwaukee Field Office. I have received specialized training in the enforcement of the federal firearm and narcotics laws, including detailed instruction in the areas of drug identification, investigative techniques, criminal law, undercover operations, informant development and handling, physical and electronic surveillance, and the debriefing of defendants, witnesses, and informants. My training has also included instruction on the various methods and procedures utilized by drug organizations to illegally import, transport, and distribute controlled substances and listed chemicals used to manufacture controlled substances, as well as the methods drug organizations use to launder and conceal proceeds of their drug trafficking and protect these operations through intimidation and violence.

2. During the course of my career, I have been involved in several hundred investigations related to street gang organizations and their distribution of controlled substances, either as a case agent or in a supporting role. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, and the

interception of wire communications. I have debriefed numerous defendants, informants, and witnesses who have personal knowledge regarding drug trafficking organizations. As a result, I am familiar with the methods of operation of narcotics traffickers, including the distribution, storage, and transportation of narcotics, and the collection of the proceeds of narcotics trafficking and money laundering, in violation of Title 21, United States Code, Sections 841, 843, 846, 952, 960, 963, and Title 18, United States Code, Sections 1956.

3. The following information is based upon my personal observations, recorded conversations,[1] knowledge and information I received from other federal law enforcement officers, the Aurora, Illinois Police Department (APD), members of the North Central Narcotics Task Force, as well as from cooperating witnesses who have proven reliable and provided information which has been independently corroborated, as set forth in part herein.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of an arrest warrant and a complaint charging JASON FOSTER, also known as "Sleepy," with violations of Title 21, United States Code, Section 841(a)(1), it does not contain all the information known to me concerning this investigation.

### The February 21, 2007 Transaction

5. In or about February 2007, a confidential informant ("the CI") was approached by law enforcement in connection with the CI's suspected participation in narcotics trafficking in and about Aurora, Illinois. When the CI was approached, he/she expressed a desire to assist law enforcement

---

[1] Any discussion or interpretation of these recorded conversations in this Affidavit are based on my review of the recordings themselves and the context of the investigation to date. Formal transcripts have not yet been prepared for these recorded conversations.

with respect to other individuals the CI knew were distributing narcotics in Aurora.[2] Since that time, the CI has voluntarily been cooperating with the ATF. The CI is not currently facing criminal charges in any jurisdiction. To date, the CI has been paid approximately $6,160 in exchange for his/her assistance in this and other investigations, which total includes a payment of approximately $5,300 for safety-related relocation expenses. Furthermore, no promises have been made to the CI regarding any of his/her previous illegal acts, although the CI is of the belief that his/her cooperation will be considered by law enforcement in connection with any charging and/or sentencing decisions relating to any criminal exposure he/she may have. The information provided by the CI has been corroborated by independent investigation that included physical surveillance, consensually-recorded telephone calls, and controlled purchases of narcotics. The CI identified FOSTER as a member of the Gangster Disciples street gang in Aurora.

6. On or about February 21, 2007, the CI, at the direction of the ATF, had an unrecorded telephone conversation with FOSTER in which the CI arranged to purchase one-half ounce of crack cocaine from FOSTER. During the course of this telephone conversation, FOSTER informed the CI that the one-half ounce of crack cocaine was going to cost $350.

7. As a result of this telephone conversation, the CI in fact met with FOSTER on February 21, 2007 in order to complete a one-half ounce crack cocaine transaction. Before the CI met with FOSTER, agents of the ATF searched the CI and his/her vehicle for the presence of money, firearms, and narcotics. This search was negative. In addition, agents equipped the CI with a

---

[2] The CI has the following criminal history. The CI has arrests for offenses such as fleeing the police, resisting a police officer, theft, obstruction of justice, weapons offenses, narcotics offenses, and traffic offenses. The CI has been convicted of obstruction of justice, fleeing the police, theft, a weapons offense, and narcotics offenses. The CI's most recent conviction was in 2006.

3

concealed audio and video recording device, and they provided CW1 with $450 in previously recorded buy money. $350 of that amount was to purchase the half-ounce of crack cocaine while the remaining $100 was to repay a previous drug debt the CI owed FOSTER.

8. The CI was kept under surveillance by law enforcement as the CI drove from the pre-arranged staging area to meet with FOSTER. As the CI was driving, the CI placed a call to FOSTER inquiring where the transaction would take place. FOSTER instructed the CI to meet him at Individual A's house, which the CI understood to mean a house located on the 100 block of North Trask Street in Aurora. Upon arriving at the house on North Trask, the CI got out of his/her vehicle and met with FOSTER[3] on the sidewalk. This meeting was consensually recorded both with video and audio by means of the concealed recording device on the CI's person.

9. While on the sidewalk, the CI and FOSTER further negotiated the CI's purchase of the one-half ounce of crack cocaine.[4] FOSTER and the CI confirmed that the price for the crack cocaine would be $350. During this time, the CI also informed FOSTER that the CI had $100 to pay on the old drug debt. With the terms for the transaction finalized, FOSTER invited the CI into the garage of the house on North Trask to complete the transaction. Once inside the garage, FOSTER handed the CI a plastic baggie which contained a tan, rock-like substance (suspect crack cocaine). At that point, the CI asked FOSTER how much crack cocaine was in the baggie and FOSTER

---

[3] Agents conducting surveillance were able to confirm that the individual meeting with the CI on both February 21, 2007 and March 14, 2007 was, in fact, FOSTER. Agents reviewed an Illinois Department of Corrections ("IDOC") photo of FOSTER prior to the transactions and then identified the person meeting with the CI as the same person in the IDOC photo (FOSTER).

[4] Agents have been able to confirm FOSTER's voice on the recordings by reviewing the recordings and listening to the voice coming from the individual who has been identified as FOSTER as discussed in footnote three above. Agents have been able to identify FOSTER's voice on all of the consensual recordings in this case through this method.

4

responded that it contained "13.5 grams" (or approximately one-half ounce). The CI then counted out the buy money and provided it to FOSTER.

10. After the transaction was complete, the CI left the house on North Trask and returned, under the surveillance of law enforcement, to the pre-arranged staging area and turned over the suspect crack cocaine to the agents. In addition, the CI and his/her vehicle were searched for the presence of money, firearms, and narcotics. Those searches were negative.

11. The suspect crack cocaine delivered to the CI by FOSTER on February 21, 2007 was subsequently analyzed and weighed by a chemist at the North Central Laboratory of the Drug Enforcement Administration (DEA) (hereinafter the "DEA Laboratory"). The substance tested positive for the presence of cocaine base with a net weight of approximately 12.4 grams. Based upon the appearance of the substance, the context of the recorded transaction between the CI and FOSTER, and my experience investigating narcotics trafficking offenses, I believe the substance was crack cocaine.

### The March 14, 2007 Transaction

12. On or about March 14, 2007, the CI had an unrecorded telephone conversation with FOSTER in which the CI arranged to purchase multiple ounces of crack cocaine from FOSTER. FOSTER quoted the CI a price of $800 per ounce of crack cocaine. The transaction was set for later that day.

13. On or about March 14, 2007, at approximately 2:00 p.m., the CI and FOSTER engaged in a consensually recorded telephone conversation regarding the crack cocaine transaction they had discussed earlier that day. During this call, FOSTER instructed the CI to meet him near Trask

5

Avenue in Aurora (the same location where the first, half-ounce transaction had taken place) to complete the transaction.

14. As a result of these telephone conversations, the CI had a consensually recorded face-to-face conversation with FOSTER at the house on North Trask Avenue on March 14, 2007. Before the CI met with FOSTER, agents of the ATF searched the CI and his/her vehicle for the presence of money, firearms, and narcotics. This search was negative. In addition, agents equipped the CI with a concealed audio and video recording device and they provided the CI with $1,800 in previously recorded buy money. The CI was kept under surveillance by law enforcement as CW1 drove from the pre-arranged staging area to the house on North Trask Avenue.

15. Upon arriving at the house on North Trask Avenue, the CI initially met with FOSTER on the driveway of the house. During a brief conversation there, the CI asked if he/she could purchase three ounces of crack cocaine even though the CI only had $1,800 in cash. In response, FOSTER told the CI that he would sell the CI two and one-half ounces of crack cocaine for $1,850. FOSTER then said that he would take the $1,800 in cash the CI had and then the CI would owe him the remaining $50. At that point, the CI saw (and surveillance confirmed) FOSTER enter the house on North Trask Avenue. The CI remained outside.

16. A few minutes later, FOSTER exited the house and met with the CI in FOSTER's blue pick-up truck, which was parked in the driveway of the house on North Trask Avenue. Once inside FOSTER's truck, FOSTER handed the CI a plastic baggie that contained three smaller plastic baggies each of which contained a tan, rock-like substance (suspect crack cocaine). The CI then counted out $1,800 in buy money and provided it to FOSTER. The CI next asked FOSTER if the CI could purchase a firearm from FOSTER. FOSTER told the CI that he currently had a .45 caliber pistol and

a .25 caliber pistol. The CI asked to purchase the .45 caliber pistol from FOSTER. FOSTER refused to sell the pistol because it "had a body on it." Law enforcement and the CI understood FOSTER to be saying that the .45 caliber pistol had been used in a homicide. FOSTER then said that he would try to find a .380 caliber pistol to sell to the CI.

17. After the transaction was complete, the CI left the house on North Trask and returned, under the surveillance of law enforcement, to the pre-arranged staging area and turned over the suspect crack cocaine to the agents. In addition, the CI and his/her vehicle were searched for the presence of money, firearms, and narcotics. Those searches were negative.

18. The suspect crack cocaine delivered to the CI by FOSTER on March 14, 2007 was subsequently analyzed and weighed by a chemist at the DEA Laboratory. The suspect crack cocaine tested positive for the presence of cocaine base with a net weight of approximately 63.3 grams. Based upon the appearance of the substance, the context of the recorded transaction between the CI and FOSTER, and my experience investigating narcotics trafficking offenses, I believe the substance was crack cocaine.

19.　Based on the foregoing, I believe that the actions of JASON FOSTER were in violation of Title 21, United States Code, Section 841(a)(1), in that he knowingly and intentionally distributed a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

_____
Mark A. Anton, Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Subscribed and sworn to before me this
26 day of November, 2007

_____
JEFFREY COLE
United States Magistrate Judge

8